AO-106 (Rev: 06/09)-Application for Search Warrant

# UNITED STATES DISTRICT COURT

for the

Northern District of Oklahoma

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *A purple Apple iPhone 12 Pro Max and a black Apple* | ) | Case No. 23-mj-641-JFJ |
| *iPhone 13 Pro Max, Currently Stored at the Tulsa Police* | ) | |
| *Department Property Room in Tulsa, Oklahoma* | ) | **FILED UNDER SEAL** |
| | ) | |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment "A"

located in the ___Northern___ District of ___Oklahoma___, there is now concealed *(identify the person or describe the property to be seized):*

See Attachment "B"

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| **18 U.S.C. §§ 922(g)(1) and 924(a)(8)** | **Felon in Possession of Firearms and Ammunition** |
| **18 U.S.C. §§ 922(o) and 924(a)(2)** | **Illegal Possession of Machine Guns** |

The application is based on these facts:

**See Affidavit of Ben Nechiporenko attached hereto.**

☑ Continued on the attached sheet.

☐ Delayed notice of ___ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Ben Nechiporenko SA ATF
*Printed name and title*

Subscribed and sworn to by phone.

Date: ___11/22/2023___

_____
*Judge's signature*

City and state:  Tulsa, Oklahoma

Jodi F. Jayne, U.S. Magistrate Judge
*Printed name and title*

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| In the Matter of the Search of a purple Apple iPhone 12 Pro Max and a black Apple iPhone 13 Pro Max, Currently Stored at the Tulsa Police Department Property Room in Tulsa, Oklahoma | Case No.<br><br>**FILED UNDER SEAL** |

**Affidavit in Support of an Application
Under Rule 41 for a Warrant to Search and Seize**

I, Ben Nechiporenko, being first duly sworn under oath, depose and state:

**Introduction and Agent Background**

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant authorizing the examination of property—electronic devices—which are currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2. I am a federal law enforcement officer as defined under Rule 41(a)(2)(C) and am authorized to request this search warrant because I am a government agent who is engaged in enforcing federal criminal laws and I am within the category of officers authorized by the Attorney General to request such a warrant.

3. Since 2022, I have been employed as a Special Agent with the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") in Tulsa, Oklahoma. I am currently assigned to the ATF Dallas Field Division – Tulsa Field Office. As a

result of my employment with ATF, my duties include, but are not limited to, the investigation and enforcement of illegal use, possession, and trafficking of firearms. Additionally, my duties include investigations involving criminal organizations, arson, gang activity, illegal use and possession of explosives, unlawful possession of machinegun conversion devices ("MCD"), and felons in possession of firearms and ammunition.

4. Prior to my tenure as an ATF Special Agent, I was a sworn law enforcement officer employed with the West Fargo Police Department in North Dakota from October 2012 to January 2022. During my employment with the West Fargo Police Department, my primary assignments included: Patrol Officer with the Patrol Division, Detective for the Metro Street Crimes Unit with the Special Investigations Division, Task Force Officer and Team Leader with U.S. Marshals Service Violent Offender and Fugitive Task Force, and Patrol Sergeant with the Patrol Division. My training included over 1,250 hours of Police Officer Standards & Training (POST) approved training hours with an emphasis in gangs and narcotics enforcement. I served nine years with the Army National Guard as a Combat Engineer and received an Honorable Discharge at the rank of Sergeant. I received a Bachelor of Science Degree in Criminal Justice from North Dakota State University in 2011.

5. As part of my duties as an ATF Special Agent, I investigate criminal violations in the Northern District of Oklahoma to include Title 18 U.S.C. §§ 922(g)(1) and 924(a)(8) Felon in Possession of Firearms and Ammunition and 18 U.S.C. §§ 922(o) and 924(a)(2) Illegal Possession of Machine Guns.

6. I am familiar with the facts and circumstances of this investigation. The facts set forth in this affidavit are based on my personal observations, knowledge obtained from other law enforcement officers, my review of documents related to this investigation, conversations with others who have personal knowledge of the events and circumstances described herein, and a review of open-source information including information available on the Internet. Because this affidavit is submitted for the limited purpose of establishing probable cause in support of the application for a search warrant, it does not set forth each and every fact I or others have learned during the course of this investigation.

7. Based on my training, experience, and the facts set forth in this affidavit, there is probable cause to believe that evidence of violations of Title 18 U.S.C. §§ 922(g)(1) and 924(a)(8) Felon in Possession of Firearms and Ammunition and 18 U.S.C. §§ 922(o) and 924(a)(2) Illegal Possession of Machine Guns, as described in Attachment B and is recorded on the device described in Attachment A.

## Identification of the Device to be Examined

8. The property to be searched is a purple Apple iPhone 12 Pro Max and a black Apple iPhone 13 Pro Max, hereinafter the "Devices." The Devices are currently stored at the Tulsa Police Department Property Room in Tulsa, Oklahoma.

9. The applied-for warrant would authorize the forensic examination of the
Devices for the purpose of identifying electronically stored data particularly
described in Attachment B.

## Probable Cause

10. On September 25, 2022, Tulsa Police Department Officer Josephson was on
patrol near 519 North Sheridan Road Tulsa, Oklahoma. At approximately 8:00 p.m.,
according to police reports, Officer Josephson observed three males enter a 2016
Chevrolet Silverado (Oklahoma License Plate "LSC185"). The vehicle was
discovered having expired registration.

11. Officer Josephson conducted a traffic stop on the vehicle near 6500 East
Haskell Place, Tulsa, Oklahoma and contacted the driver, J.U. While speaking with
J.U., Officer Josephson detected the odor of marijuana from inside the vehicle and
observed alcoholic beverages in plain sight. J.U. informed Officer Josephson that the
vehicle belonged to his biological brother, Julio Urquiza ("URQUIZA") (Date of
Birth XX/XX/1994).

12. Officer Josephson conducted a probable cause search of the vehicle. During
the search, Officer Josephson located one loaded .45 caliber Glock pistol magazine
and three .223 caliber live ammunition cartridges inside the vehicle. J.U. told Officer
Josephson the Glock magazine, ammunition within the magazine, and the .223
caliber cartridges belonged to URQUIZA. J.U. also told Officer Josephson the
vehicle listed above was purchased by URQUIZA, but was not yet registered in his

4

name. J.U. also stated he and URQUIZA live together at 1550 North Evanston Place, Tulsa, Oklahoma and that they see each other on a daily basis.

13. Tulsa Police Department ("TPD") Officer Damien Banks conducted a "records check" of URQUIZA and discovered he was a convicted felon through Tulsa County cases CF-2018-297 (Counts 1 and 2: Unlawful Possession of Controlled Drug with Intent to Distribute, and Count 3: Acquire Proceeds from Drug Activity) and CF-2017-1415 (Count 1: Unlawful Possession of Controlled Drug with Intent to Distribute, and Count 2: Acquire Proceeds from Drug Activity). Convicted felons are prohibited from possessing firearms and ammunition.

14. Officer Banks conducted a Facebook search of URQUIZA and located an account identified as "Julio Urquiza." The Facebook profile picture was compared to a booking photo of URQUIZA taken August 2022. Officer Banks positively identified URQUIZA through the photographs. While searching through URQUIZA's Facebook, Officer Banks located a photograph of URQUIZA possessing a black firearm in his waistband, posted January 1, 2021. From training and experience, Officer Banks believed the firearm was a Glock semi-automatic style firearm, which would contain the same brand of the magazine which was recovered from Julio URQUIZA's vehicle on September 25, 2022. Additionally, from training and experience, Officer Banks believed the style of grip, backstrap, and magazine well resembled the characteristics of a Glock firearm; the same type of firearm issued to the officer in the Tulsa Police Academy.

15. On September 30, 2022, Officer Banks conducted surveillance at 1550 North Evanston Place Tulsa, OK 74110 and made positive identification of URQUIZA's vehicle, a 2016 Chevy Silverado (OK/LSC185). URQUIZA's truck (LSC185) was parked in a parking lot directly across the street from 1550 North Evanston Place. There were three or four vehicles parked in the driveway which caused URQUIZA's large truck to be parked across the street.

16. On October 8, 2022, Officer Banks applied for and obtained a State of Oklahoma search warrant for the residence at 1550 North Evanston Place, Tulsa, Oklahoma. The search warrant was signed by a Tulsa County Judge.

17. On October 13, 2022, Tulsa Police Department officers served the search warrant at 1550 North Evanston Place, Tulsa, Oklahoma. During the search, officers searched a closet near the front door and found the following: a Glock 30, .45 auto caliber semi-automatic pistol; Glock 17 9x19 caliber semi-automatic pistol; Browning Highpower 9mm pistol; 37mm flare launcher; and a AR-style upper receiver. Specifically, magazines containing live rounds of .45 and 9mm caliber ammunition, the same caliber used in a Glock 30 and Glock 17, were found. The three pistols were concealed within neatly folded clothing on the shelf of the closet. Officers located several different calibers of bagged and/or boxed ammunition and several firearm magazines.

18. Officer Banks discovered both Glock pistols had attachments on the back and recognized them to be machine gun conversion devices commonly referred to as

"Glock Switches." Officers contacted ATF special agents while URQUIZA was detained outside 1550 North Evanston Place, Tulsa, Oklahoma.

19. Officer Badgett read URQUIZA his Miranda Rights, and URQUIZA stated he understood. URQUIZA was questioned by Officer Banks with Officer Badgett present. URQUIZA stated that he lived at the 1550 North Evanston Place residence for about two months. URQUIZA stated he did not have a bedroom and had been sleeping on the couch. When asked about where he kept his clothes, URQUIZA stated he used the closet by the front door. URQUIZA stated for the most part everything in the closest was his property and that he's the person who bought the "plate carrier" police found. Please note, a "plate carrier" is a tactical vest worn around the upper torso of a person's body that attaches and carries armor plates to protect a shooter's body from fired ammunition. When asked about where he obtained the Glock firearms, URQUIZA said, "I buy and trade all day." He admitted that he cleaned firearms and traded an AR receiver for a firearm since he is unemployed. When asked about the firearms, without police indicating they found a .45 caliber Glock firearm, URQUIZA said, "It was a .45 right?" URQUIZA also said he owned the Glocks for around a month or two prior to the search warrant execution. When questioned about the missing AR-15 lower receiver, URQUIZA admitted he traded it in return for one of the modified Glock pistols, but could not specify which Glock pistol. According to police, the two Glock pistols resembled the firearm URQUIZA was observed handling in the previously mentioned Facebook photograph. To police, URQUIZA said, "…I just clean guns, that's all I do…"

7

When shown the two Devices recovered by police from the search warrant execution, URQUIZA admitted both Devices were his property and refused to give the passcodes for the Devices.

20. ATF Special Agents Edwards, Nguyen, and I responded to the residence and examined the firearms. A Glock Model 17 Gen 4, 9x19mm pistol (Serial #BEZK851) and the Glock Model 30 Gen 4, .45 caliber pistol (Serial #BFCW496). Both appeared to be converted to machine guns as they each had machinegun conversion devices (MCD's) commonly referred to as "Glock Switches" installed on each of them.

21. S/A Nguyen and I spoke with URQUIZA who was detained in a Tulsa PD Squad Car. I read URQUIZA his Miranda Rights. URQUIZA verbally invoked his right to counsel. Without questioning, URQUIZA spoke about the firearms in the residence. He stated most of the firearms belonged to his parents, but he admitted the two Glock pistols with "switches" were his property. URQUIZA further admitted the "switches" affixed to his firearms were extremely common and were even being "printed"; a reference to three-dimensional MCD printing. The conversation was audio recorded. I took custody of the two Glock pistols and ammunition loaded in each pistol's magazine. The firearms were entered into ATF evidence and later sent to the ATF Firearms, Ammunition, and Technology Division (FATD) lab for machine gun determination.

22. URQUIZA was arrested by Tulsa Police and placed in state custody due to his two active "Application to Revoke" warrants through Tulsa County regarding

Tulsa County Case Files CF-2018-297 and CF-2017-1415, previously referenced in Paragraph 13.

23. A state search warrant was applied for and obtained regrading URQUIZA's purple Apple iPhone 12 Pro Max and black Apple iPhone 13 Pro Max. The search warrant was granted and executed; however, Tulsa PD Detective Ackermann was unable to complete forensic extractions for the devices because law enforcement software could not bypass the device's security.

24. On October 18, 2022, ATF S/A Edwards examined the Glock Model 17 Gen 4, 9x19mm pistol (Serial #BEZK851 and a Glock Model 30 Gen 4, .45 caliber pistol (Serial #BFCW496) to determine their origin and status as to their travel in interstate and/or foreign commerce. Additionally, the examination was also for the purpose of determining classification under Title 18 U.S.C. Chapter 44, Section 921. Based on the examination of the firearms, and in conjunction with the research, knowledge, and experience of S/A Edwards, it was her opinion that both firearms were manufactured outside the State of Oklahoma and traveled in interstate and/or foreign commerce. The items are classified as firearms. The term "firearm" is defined in Title 18 U.S.C. Chapter 44, Section 921 (a) (3).

25. On August 3, 2023, I received a Report of Technical Examination regarding machine gun determination for the Glock Model 17 Gen 4, 9x19mm pistol (Serial #BEZK851 and a Glock Model 30 Gen 4, .45 caliber pistol (Serial #BFCW496). The report was completed by ATF Firearms Enforcement Officer (FEO) Christopher Cochran and indicated both the Glock 17 Gen 4, 9x19mm, Serial #BEZK851 and

9

Glock 30 Gen 4, .45 caliber, Serial #BFCW496 were examined and determined to be "Firearms" and "Machineguns." The report additionally indicated both firearms were manufactured in Austria, and imported by Glock Inc, in Smyrna, Georgia.

26. On November 21, 2023, I was informed by Secret Service Network Intrusion Forensic Analyst Travis Berg that law enforcement attempted to gain access to Urquiza's phone shortly after his arrest by way of an extraction product known as Graykey. Generally, once a phone is connected, Graykey software will attempt to gain cell phone password information through a process known as "brute force." Access to a person's phone via Graykey is dependent on the relationship between Graykey's most recent software update and a mobile phone's level of operating system ("iOS"). In this case, a "brute force" entry into Urquiza's cell phones was unsuccessful because Graykey's software, at the time, was not compatible with the iOS on Urquiza's phones. Between the time of the attempted extraction in the beginning of this investigation and today's date, the Secret Service is aware that software updates were made to Graykey. Based on recent Graykey software updates, new iOS updates may support brute force entry into Urquiza's cell phones.

27. The Device is currently in the lawful possession of TPD. It came into the TPD's possession in the following way: the Devices were seized as part of a lawfully executed search warrant at 1550 North Evanston Place, Tulsa, Oklahoma, and taken during the execution of the search warrant.

28. The Device is currently in storage at Tulsa Police Department in Tulsa, Tulsa County, in the Northern District of Oklahoma. In my training and experience, I

know that the Devices have been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the Device first came into the possession of TPD.

### Technical Terms

29. Based on my training and experience, I use the following technical terms to convey the following meanings:

> a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic films. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where

12

it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments, or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer

13

software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f.   IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

g.   Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

30. Based on my training, experience, and research, and from consulting the manufacturer's advertisements and product technical specifications available online

14

https://www.apple.com/iphone/, I know that the devices have capabilities that allow them to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA." In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

### Electronic Storage and Forensic Analysis

31. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period on the device. This information can sometimes be recovered with forensics tools.

32. I know that cellular telephones are often equipped with digital cameras and those phones possess the capability to transmit and/or store electronic images. I know that in many cases, cellular telephones maintain photographs of illegal activities to include evidence of illegal possession of firearms, ammunition, MCDs, or materials used in the construction of firearms and MCDs and the illegal purchase or acquisition of firearms, explosives devices, or materials used in the construction of firearms and MCDs. These photos are sometimes stored in their cellular phones and often are transmitted or sent from one electronic media device to another. I also know that cellular phones may also contain notes regarding potential illegal acts that are recorded by the subject who possesses the electronics. Furthermore, I know that text messages, emails are often used by two or more persons to communicate

15

information regarding the illegal possession or acquisition of firearms, explosive devices, or materials used in the construction of explosive devices and/or violent crime and other illegal activities, between principals and co-conspirators of those crimes.

33. I know that cellular telephones are utilized by most individuals in the United States and have become a staple of communication between individuals using text messaging, visual and audible communications (telephone calls and FaceTime type communications) as well as applications like "Facebook Messenger". Additionally, individuals utilize their cellular devices to take pictures, keep notes, as a GPS (global positioning System) device, and even to conduct illicit or illegal activity. Communications on phones are kept for long periods and transferred from one phone to another when replaced. This is done using Cloud storage and direct transfer conducted at the time of purchase or by the individual themselves. Individuals utilize this method as not to lose data that is stored on the phone such as contacts, photos, notes, and other important information to the individual. This data includes contacts used to conduct illegal activities to include construction or assembly of illegal MCDs and firearms.

34. Cellular telephones are often used to facilitate offenses and allow criminals to maintain communication with each other before, during and after the commission of offenses. I am aware that cellular telephones have the capacity to store a vast amount of information, including but not limited to: telephone numbers, voice messages, text messages, e-mail, photographs, videos, address books, records, phone call histories,

contact and other information. This information may be contained on the cellular telephone.

35. Based on my training and experience, I know that individuals involved in criminal activity often use cell phones and other electronic devices to further their trade by conducting business on them via text messages and phone calls. Individuals involved in violent crime also trade images of firearms, explosive devices, or materials used in the construction of explosive devices and/or items from their illegal activity on their phone as well. I also know from training and experience that:

a. Cellular telephones are almost always used by persons engaging in criminal activities as a means of communication. They will communicate by verbal conversations, digital text messaging, and/or sending photographs to one another.

b. Persons engaged in criminal activities carry and possess firearms or explosive devices during and in relation to and in furtherance of crimes. They also photograph themselves and others with controlled substances, firearms or explosive devices, and money proceeds. Such photographs are often kept in digital form on cell phones.

c. Cellular telephones may also contain notes, emails, and text messages regarding money laundering, or inquiries for firearms, explosive devices, or materials used in the construction of explosive devices by the subject who possesses the cellular telephone.

17

d.  Text messages and e-mails are often used by two or more persons to communicate information regarding illegal activities between two telephones or between one telephone and a personal computer. This information can include directions for deliveries, stash locations, prices, cell phone contact numbers, and instructions.

e.  Cellular telephones often contain stored phone numbers and contact information of individuals that conduct business with other co-conspirators that possess the cellular telephone.

f.  People who have previous felony convictions utilize many methods to obtain firearms. These methods include but are not limited to gun show purchase from private sellers, straw purchasers, stolen firearms, trading firearms for narcotics and stealing firearms. The use of cellular devices is a key way for these individuals to communicate in the movement of illegally obtained firearms. They utilize the devices to take pictures of firearms, discuss prices, brag about the firearms they have, and talk about the origin of the firearm (if it is stolen or has been involved in other crimes). They also use their phones to order firearms or communicate the type of firearm they would like someone to purchase for them when utilizing a straw purchaser. The phone's internet function can be used to look up firearms as well as dealers in the area that the straw purchaser can buy from, and to access third-party suppliers such as Armslist and Gun Broker. Information

about the sale and purchase of firearms is communicated via messaging, which many times include pictures.

g. An additional avenue prohibited persons frequently use to obtain firearms is through the straw purchase of a firearm which is done when a non-prohibited person buys a firearm through traditional means for a prohibited person, at the direction of the non-prohibited person to include style, make, model, and caliber and sometimes even the individual to buy from. Frequently, this communication between the non-prohibited and prohibited person takes place via cellular device to include text messages with both instructions for purchase and pictures of firearms or MCDs to be obtained or sold.

h. Additionally, I know from my training and experience that many individuals who possess MCDs, may construct them as homemade devices or conduct extensive research online regarding the needed materials and how to effectively assemble their desired MCD. Internet history data found in cell phones is likely to show a record of a search history for instructions on MCDs, as well as a history of visiting websites with information on the assembly of MCDs and required materials.

i. In summary, prohibited persons frequently use cellular phones to obtain their illegally possessed firearms or MCDs whether it be through third party web sites, private purchase, or through straw purchase.

38. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the Devices because:

   a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

   b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

   c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

   d. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored

on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

39. *Nature of examination*. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

40. *Manner of execution*. Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

41. *Methods of examination*. In conducting this examination, law enforcement personnel may use various methods to locate evidence and instrumentalities of the crime(s) under investigation, including but not limited to undertaking a cursory inspection of all information within the Device. This method is analogous to cursorily inspecting all the files in a file cabinet in an office to determine which paper

evidence is subject to seizure. Although law enforcement personnel may use other methods as well, particularly including keyword searches, I know that keyword searches and similar methods are typically inadequate to detect all information subject to seizure. As an initial matter, keyword searches work only for text data, yet many types of files commonly associated with stored cellular device data, such as pictures and videos, do not store as searchable text. Moreover, even as to text data, keyword searches cannot be relied upon to capture all relevant communications associated with a cellular device, as it is impossible to know in advance all of the unique words or phrases investigative subjects will use in their communications. Consequently, often many communications in cellular device data that are relevant to an investigation do not contain any searched keywords.

## Conclusion

42. Based on the information above, I submit that there is probable cause for a search warrant authorizing the examination of the Devices described in Attachment A to seek the items described in Attachment B.

43. I request to be allowed to share this affidavit and the information obtained from this search with any government agency, to include state and local agencies investigating or aiding in the investigation of this case or related matters, and to disclose those materials as necessary to comply with discovery and disclosure obligations in any prosecutions from this matter.

Respectfully submitted,

_____
Ben Nechiporenko
Special Agent
Bureau of Alcohol, Tobacco, Firearms
& Explosives

Subscribed and sworn to by phone on November 22, 2023.

_____
JODI F. JAYNE
UNITED STATES MAGISTRATE JUDGE

23

## ATTACHMENT A

### Property to be Searched

The property to be searched is a purple Apple iPhone 12 Pro Max and a black Apple iPhone 13 Pro Max, hereinafter the "Devices." The Devices are currently located at the Tulsa Police Department in Tulsa, Tulsa County, in the Northern District of Oklahoma.

This warrant authorizes the forensic examination of the Devices for the purpose of identifying the electronically stored information described in Attachment B.



Black Apple iPhone 13 Pro Max



Purple Apple iPhone 12 Pro Max

## ATTACHMENT B

### Particular Things to be Seized

All records on the Devices described in Attachment A that relate to Title 18 U.S.C. §§ 922(g)(1) and 924(a)(8) Felon in Possession of Firearms and Ammunition and 18 U.S.C. §§ 922(o) and 924(a)(2) Illegal Possession of Machine Guns including:

1. Records relating to communication with others as to the criminal offense(s) listed above; including incoming and outgoing voice messages; text messages; emails; multimedia messages; applications that serve to allow parties to communicate; all call logs; secondary phone number accounts, including those derived from Skype, Line 2, Google Voice, and other applications that can assign roaming phone numbers; and other Internet-based communication media;

2. Records relating to documentation or memorialization of the criminal offense(s) listed above, including voice memos, photographs, videos, and other audio and video media, including Exchangeable Image File ("EXIF") data and any other metadata associated with those photos and videos, including device information, geotagging information, and information about the creation date of the audio and video media;

3. Records relating to the planning and execution of the criminal offense(s) above, including Internet activity, firewall logs, caches, browser history, and

cookies, "bookmarked" or "favorite" web pages, search terms that the user

entered into any Internet search engine, records of user-typed web addresses,

account information, settings, and saved usage information;

4. Application data relating to the criminal offense(s) above;

5. Threating communications related to the criminal offense(s) listed above;

6. Information related to co-conspirators, stash house locations used to store

firearms, destructive devices, or materials used to construct destructive

devices, admissions of criminal offense(s) related to the offense(s) listed above

and information related to the acquisition or attempted acquisition of other

destructive devices, components, firearms or ammunition in the future or

already completed and related identifying information;

7. Any information related to sources of acquiring MCDs, components, firearms,

body armor, plate carriers, ammunition, co-conspirators, aiders and abettors

of information related to the illegal possession of firearms as well as others

(including names, addresses, phone numbers, or any other identifying

information); information relating to instructions for transportation, obtaining

and storing illegally possessed firearms, and information relating to means of

transportation for illegally possessed ammunition, firearms, or MCDs;

8. All information, data, and photographs related to the possession, acquisition,

and use of firearms, components, MCDs, or ammunition;

9. All bank records, checks, credit card bills, account information, and other financial records.

10. Evidence of user attribution showing who used or owned the Devices at the time the things described in this warrant were created, edited, or deleted, such as logs, phone books, saved usernames and passwords, documents, and browsing history;

11. All records and information related to the geolocation of the Devices from July 13, 2022 to October 22, 2022;

12. All records and information related to the coordination, agreement, collaboration, and concerted effort of and with others to violate the criminal statutes listed above.

As used above, the terms "records" and "information" include all the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.